# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LISA CARTER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY NATIONAL BANK AND TRUST COMPANY OF LAWTON, OKLAHOMA, and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No.  CIV-21-29-PRW<br><br><br>**<u>CLASS ACTION - COMPLAINT</u>**<br><br><br>DEMAND FOR JURY TRIAL |

# I    INTRODUCTION

1.    Lisa Carter ("Plaintiff") brings this lawsuit against The City National Bank and Trust Company of Lawton, Oklahoma ("City National" or "Defendant") on behalf of City National's customers, on the basis that City National has violated and continues to violate Federal Reserve Regulation E, 12 C.F.R. § 1005.1, et seq. ("Reg E" or "Regulation E"). Regulation E requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure document describing their overdraft services (opt-in disclosure agreement); (2) provide that disclosure as a stand-alone document not intertwined with other disclosures; and (3) obtain verifiable affirmative consent of a customer's agreement to opt-in to the financial institution's overdraft program. Moreover, Regulation E prohibits financial institutions from actively encouraging customers to opt into their overdraft programs, such as by linking Regulation E opt-in to other account perks (or detriments if a customer chooses not to opt-in).

2.    Specifically, in order to comply with Regulation E, City National must provide customers with a Regulation E opt-in disclosure agreement describing its overdraft services. But City National does not provide its customers, including Plaintiff, with a Regulation E opt-in disclosure agreement containing accurate language describing the circumstances in which City National intends to charge them overdraft fees. Specifically, on information and belief, it does not use a stand-alone opt-in disclosure agreement that accurately and in an easily understandable manner describes City National's overdraft services including, but not limited to, failing to state or clearly describe that an overdraft occurs when the "available balance" is below zero, when that is

2

its practice. Further, City National has a policy of charging its customers a fee for declined debit card transactions (an almost unheard of practice in the financial industry). This is because Regulation E prohibits the practice through its proscription of offering encouragements to sign up for Regulation E overdraft coverage.

3.      Because Regulation E does not permit financial institutions to charge overdraft fees until they obtain affirmative consent from consumers after making an accurate disclosure of their overdraft practices in a stand-alone opt-in disclosure agreement, City National's assessment of all overdraft fees against customers for one-time debit card and ATM transactions has been, and continues to be, illegal. Further, on information and belief, City National's continued use of a non-conforming disclosure agreement to "opt-in" new customers to its overdraft service is invalid under Regulation E.

4.      Regulation E itself provides a cause of action for failing to abide by its requirements. Plaintiff thus seeks statutory damages within the statute of limitations period. Plaintiff also seeks to enjoin City National from continuing to obtain new customers' "consent" to assess overdraft fees by using an opt-in disclosure agreement that violates Regulation E, and from continuing to assess any further overdraft fees on Regulation E transactions until it obtains the consent of current customers using a Regulation E-conforming opt-in disclosure agreement.

5.      In addition, City National utilizes other accounting gimmicks to further increase the fees it assesses to customers. City National contracts to charge its customers only a single non-sufficient funds ("NSF") fee for a returned, unpaid item when, instead, it charges multiple NSF fees for a single returned, unpaid item when the item is reprocessed by a merchant through no action of an accountholder. City National's

practice of charging multiple NSF fees on the same item violates its contracts with its customers. Moreover, City National engages in an egregious practice where it withdraws from an account the full amount of debit items that it labels as overdrafts even when it will return the debit item as unpaid and no money will actually ever be debited from the account for that item.  Instead, after debiting the money from the account one day under the guise of it being paid as an "overdraft," City National returns the item unpaid the following day and credits back the premature debit to the account. But by debiting the accountholder's money in the interim even when the money is still in the account, it lowers the account balance making it more likely that other subsequently processed items will be assessed overdraft or NSF fees. City National does this even though it fully intends to return the items unpaid, which never would have debited the money from the account. This not only deprives the customer of the amount of money in the account, it causes confusion as to the customer's balance in the account.  On information and belief, City National does not adequately disclose this practice to its customers in the Reg E disclosure, and the practice violates its contracts with its customers.  This action seeks to remedy these unlawful practices and obtain associated damages.

## II     NATURE OF THE ACTION

6.     All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel (unless otherwise stated). Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

4

7.     Plaintiff has brought this class action to assert claims in her own right, and as the class representative of all other persons similarly situated. Regulation E requires City National to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging customers an overdraft fee on one-time debit card and ATM transactions. Because of the substantial harm to customers of significant overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all pertinent overdraft information in one clear and easily understood document. Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials. Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies. Moreover, financial institutions are not permitted to actively encourage customers to opt-in for Regulation E overdraft coverage.

8.     City National does not meet these requirements. On information and belief, it does not provide its customers with a compliant stand-alone Regulation E opt-in disclosure agreement because, *inter alia*, it fails to accurately and in an easily understandable manner describe City National's overdraft services including, but not limited to, failing to state or clearly describe that an overdraft occurs when the "available balance" is below zero.  It also threatens additional fees for declined transactions that would not be assessed if opted into overdraft coverage, and fails to adequately describe its practice of debiting accounts for transactions it labels as "overdrafts" only to return them unpaid the next day, which inaccurately reduces the account's balance for the term of the debit.

9.     City National's own internal bookkeeping practice is to calculate account holders' account balances for overdraft and NSF purposes using an artificially reduced calculation called the "available balance," which deducts from an account any money City National unilaterally decides should be held for future transactions. When these future holds are accounted for, the calculation can result in a negative "available balance" existing only on paper, even though there is actually money in the account to cover a transaction without a negative account balance at the time of payment and posting. While that practice is unfair on its face, the disclosure of the practice is at issue, not the practice itself.

10.     City National's use of the artificially reduced account balance to assess overdraft fees is material. Based on analysis with other financial institutions, it is likely City National assessed overdraft fees on 10-20% more Regulation E overdraft transactions than would otherwise be the case if it used account holders' actual balances to determine if accounts were overdrawn.

11.     Plaintiff has been harmed by City National's Regulation E violations. On information and belief, she was opted-in to City's overdraft program using an improper disclosure agreement that inaccurately described City's overdraft practices, and has been assessed overdraft fees on Reg E transactions that were not permitted because City National had earlier obtained Plaintiff's "consent" using that non-compliant agreement. This action seeks statutory damages under Regulation E, restitution, and injunctive relief due to, *inter alia*, City National's policy and practice of obtaining "affirmative consent" using a noncompliant opt-in disclosure agreement, unlawfully assessing and unilaterally collecting overdraft fees as set forth herein.

6

12.     In addition, City National's contracts state that it will only charge customers a single NSF fee on an unpaid, returned item. Yet, City National's practice is to charge multiple NSF fees or an NSF fee followed by an overdraft fee on the same item. Plaintiff has been harmed by this practice because City National charged her multiple fees based on this practice, which further reduced her balance, causing a cascade of additional overdraft transactions that she otherwise would not have been assessed. Further, on numerous occasions, City National has withdrawn items from Plaintiff's account balance calling them "overdrafts," only to re-credit them the following day after returning the items unpaid, effectively reducing her balance in the interim and making it more likely that other items would be considered as overdrafts or non-sufficient funds items. Plaintiff thus seeks monetary damages and other relief as a result of these improper practices.

### III     PARTIES

13.     Plaintiff Lisa Carter is a resident of Lawton, Oklahoma, and a City National customer at all relevant times to the allegations in this Complaint.

14.     Based on information and belief, Defendant City National is a bank with its headquarters and principal place of business in Lawton, Oklahoma. City National maintains several branches throughout Oklahoma and at least one branch in Kansas.

15.     Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

16.     Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will

be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

17.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

18.    At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

19.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

20.    As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

## IV    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or

more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This Court also has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, and 28 U.S.C. § 1367(a).

22.     Venue is proper in this District because City National maintains its headquarters in this District, transacts business in this District, Plaintiff and similarly situated persons entered contracts with City National in this District, and City National executed the unlawful policies and practices which are the subject of this action in this District.

**V     BACKGROUND**

**A.     Defendant City National**

23.     City National is a bank headquartered in Lawton, Oklahoma, with branches in more than twenty cities throughout Oklahoma, as well as at least one branch in Wichita, Kansas. As of December 31, 2019, according to its financial filings, it reported having 418 full-time employees.  As of its most recent financial filing in 2020, it holds approximately $402,958,000 in assets.

24.     One of the main services Defendant offers is a checking account. A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines. Debits decreasing the amount in a checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the

other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

25.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item) and NSF fees (a fee for a declined, unpaid returned item) to accounts when it claims to have determined that an account has been overdrawn.

26.     The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account holder's insufficient funds, it may charge a *contracted* fee, provided that charging the fee is not prohibited by some legal regulation.

27.     Financial institutions can also charge a *contracted* NSF fee when a customer's checking account purportedly lacks sufficient funds to cover an item and the financial institution opts to return the transaction item unpaid rather than cover it. Although there is very little, if any, risk to a financial institution when an item is returned unpaid, most institutions (including City National) still charge customers a very expensive fee for this purported "service."

28.     The fee Defendant charges here constitutes very expensive credit in the overdraft context that harms the poorest customers and creates substantial profit for Defendant. According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[1]

---

[1] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Jan. 4, 2021).

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added.)[2]

29.     Further, the CFPB has noted that, as opposed to overdraft program coverage, financial institutions' return of items as unpaid, which often results in the assessment and collection of NSF fees, confers little, if any, benefit to consumers:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (i.e., result in overdrafts) or returned unpaid (i.e., were NSFs). Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due.

---

[2] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Jan 4, 2021).

(Emphasis added).[3]

30.     Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[4]

31.     Defendant charges an overdraft/NSF fee of $25.00 per item. Even if Defendant had been properly charging overdraft fees, the $25.00 overdraft/NSF fee bears no relation to the financial institution's minute risk of loss or cost for administering overdraft and non-sufficient funds services. But an overdraft fee's practical effect is to charge those who pay them an interest rate with an APR in the thousands.

32.     Accordingly, overdraft and NSF fees are punitive fees rather than service fees, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[5] In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[6] More than 50% of those assessed overdraft fees do

---

[3] CFPB, CFPB Study of Overdraft Programs (June 2013), p. 26 (internal footnote omitted), https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf [last viewed Jan. 8, 2021].

[4] Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Nov. 10, 2020).

[5] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Jan. 4, 2021).

[6] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Jan. 4, 2021).

not recall opting into an overdraft program, *id*. at p. 5, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee. *Id*. at p. 10.

33.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-income, and non-white account holders are among those most likely to be assessed overdraft fees. *Id*. at p. 3. A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. *Id*. at p. 4. And non-whites are 83% more likely to pay an overdraft fee than whites. *Id*. at p. 3.

**B.     Regulation E**

34.     For many years, banks and credit unions have offered overdraft services to their account holders. Historically, the fees these services generated were relatively low, particularly when methods of payment were limited to cash, check, and credit card. But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee. The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts. Financial institutions thus recognized in overdraft fees a new and increasing revenue stream.

35.     As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small. As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

36.     Using common understanding, an overdraft occurs when two conditions are satisfied. First, the consumer initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction. Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall. An overdraft, therefore, is an extension of credit. The financial institution advancing the funds, allows the account holder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[7] The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

37.     Before the Federal Reserve adopted Regulation E, many financial institutions unilaterally adopted internal "overdraft payment" plans. Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would go ahead and cover the overdraft while charging the standard overdraft fee. Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or

---

[7] For a thorough description of the mechanics of an "overdraft," see https://www.investopedia.com/terms/o/overdraft.osp (last visited Nov. 10, 2020).

instead declined and providing the opportunity to select another form of payment rather than turning the $4 cup of coffee at Starbucks into a $40 cup of coffee.

38.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs. Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all. It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from account holders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions. After Regulation E's adoption, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program. Otherwise, the bank or credit union could either cover the overdraft without charging a fee or, simply, direct the transaction to be denied at the point of sale. Further, without the opt-in, there could be no NSF fee incurred because the denial of the transaction meant no transaction had taken place, and thus no transaction to return unpaid.

39.     With the creation of the CFPB, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to account holders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225. The CFPB

further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[8]

40.     Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest—using averages, 17,000% APR—all while assuming very little risk because only a very small percentage of the overdraft customers failed to repay the overdraft.

41.     Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts. It also provides that the opt-in disclosure agreement must satisfy certain

---

[8] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

requirements to be valid. The agreement must be a stand-alone document, not combined with other forms, disclosures, or contracts provided by the financial institution. It must also accurately disclose to the account holder the institution's overdraft charge policies. The account holder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 1005.4(a)(1). The financial institution must ultimately establish that the account holder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement. Further, the financial institution cannot actively encourage consumers to opt-in to Regulation E overdraft coverage.

42.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their account holders before charging overdraft fees on eligible transactions.

43.     But charging these exorbitant penalty fees for the bank or credit union's small advance of funds to cover overdrafts was not where it stopped. Many financial institutions began manipulating the process as to when they would consider a transaction an overdraft to further increase the profit generated by their overdraft programs. They charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but assessed overdraft fees on transactions when they

17

paid the transaction with the customers' money. That is, the financial institution unilaterally decided the account was overdrawn not by the actual lack of funds in the account, but rather, by whether the money in the account minus holds the financial institution unilaterally decided was for future events was enough to cover an ATM or one-time debit transaction when these transactions came in for payment at some future date.

44.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account. "Actual balance," "ledger balance," "current balance" or even "balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time. In contrast, "available balance" is a term the financial industry recognizes as a balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[9]

45.     Although financial institutions calculate the two balances, the actual/ledger/current balance of the money in the account is the official balance of the account. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

46.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual account balance or the "available balance" for overdraft and NSF assessment purposes, per Regulation E, the

---

[9] Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

18

terms of the overdraft program must be clearly and accurately disclosed. Whether the financial institution uses the actual money in the account or an internal artificial available balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

47.     Many financial institutions use the "available balance" for overdraft assessment purposes as it is consistent with these institutions' self-interest because the available balance is, by definition, always the same or lower than the actual balance. The actual balance includes all money in the account. The available balance, on the other hand, always subtracts any holds placed on the funds in the account that may affect the money in the account in the future. It never adds funds to the account. To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account. The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money. All of the account holder's money remains in the account, even the money Defendant has defined as "held." The fact that the money has a "hold" on it does not mean it has been removed from the account.

48.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and account holders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times, the financial institution uses the customer's own money to pay the

transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

49.     A hypothetical demonstrates what the financial institution is doing under these circumstances. Suppose that an individual has $1,000. The individual intends to use $800 of this amount to pay rent. The individual then intends to use the other $200 to make his monthly car payment. But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off. The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill. This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due. And if the individual does find the additional $40 before paying the car payment, there will never be a problem. If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill. He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

50.     The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account. Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month. That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month. The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee. He approves the water bill payment, and it posts immediately. Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car

payments post and clear the account. All three payments are made with the individual's own account funds. The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive. However, even if the customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it. Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

51. A financial institution that uses the "available balance" method of calculating overdrafts would come to a different conclusion. Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account. This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account. Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account. And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds. Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions. Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

52.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts *without clear disclosure of that practice* likely violates Reg E and other state laws. For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[10]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:[11]

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices

---

[10]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Jan 4., 2021).
[11] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Jan. 4, 2021).

could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.

53.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood. As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions. Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E.

**C.     City National's Regulation E Practices**

54.     On information and belief, City National opted customers into its overdraft practices using an opt-in disclosure agreement that violated Regulation E. The opt-in disclosure agreement was inaccurate and/or unclear because, *inter alia*, it did not inform Plaintiff and putative Class Members that City National uses the "available balance" to assess overdraft fees when that is its practice.  It also fails to adequately describe its practice of debiting accounts for transactions it labels as "overdrafts" only to return them unpaid the next day, which inaccurately reduces the account's balance for the term of the debit.

55.     Many courts have already found that failing to clearly and accurately describe an overdraft program in the Regulation E opt-in disclosure agreement constitutes

a violation of Regulation E.[12] By using inaccurate and/or ambiguous language to describe what constitutes an overdraft, City National has failed to provide a clear and easily understandable description of its overdraft services in its opt-in disclosure agreement as Regulation E demands.

56.     Many financial institutions that use the available balance to calculate overdrafts have specifically addressed the practice in their opt-in disclosure agreements. San Diego County Credit Union, for example, defines an "overdraft" as when "the available balance in your account is nonsufficient to cover a transaction at the time that the transaction posts to your account, but we pay it anyway." Synovus Bank defines an overdraft as when there is not enough money in an account, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance. TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes

---

[12] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

24

any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

57.     Here, City National's failure to accurately, clearly, and in an easily understandable way identify that it assesses overdraft fees when the available balance falls below zero and/or identify its practice of debiting accounts for transactions it labels as "overdrafts" only to return them unpaid the next day, in a stand-alone opt-in disclosure agreement resulted in its failure to obtain the appropriate affirmative consent necessary to opt customers into its overdraft program. Further, City National's threat to charge additional fees for declined transactions that would not be assessed if opted into overdraft coverage violates Regulation E's prohibition against actively encouraging customers to opt-in.  City National has and continues to charge Plaintiff and class members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E. Further, on information and belief, City National continues to "opt-in" new checking account customers into its overdraft program using an improper opt-in disclosure agreement.

**D.     Other Improper Fee-Related Practices**

**<u>Repeat NSF Fees on the Same Item</u>**

58.     Using a non-compliant Regulation E opt-in disclosure agreement that fails to accurately describe its actual overdraft practices is just one way that City National manipulates checking accounts to increase profits. It also contracts and discloses to

customers that it will only charge a single NSF fee when it opts to return a check or ACH due to a lack of funds in the account. For ACH charges, the rejection of the electronic requested charge is completely automated, and results in no risk cost to the financial institution as there is also virtually no cost to administer the automated rejection. However, the NSF fee is the same as if the transaction was paid into overdraft by the financial institution. But what is worse, financial institutions like City National not only charge one NSF fee for a returned item ($25 here), they charge multiple fees for insufficient funds on the same item and attempt to justify the practice as caused by a merchant submitting the same item for payment multiple times.

59.     While this practice is unfair, more importantly, it is not authorized by City National's contracts with customers. Those contracts do not permit the charging of multiple NSF fees based on the same item with the same merchant. Nor do they permit charging an NSF fee followed by an overdraft fee on the same item if the item is paid into overdraft on a second presentment. Instead, the contracts and relevant disclosures identify an insufficient funds fee as being singular on a per item basis.

60.     Unlike Defendant here, other banks and credit unions have been able to properly contract and disclose the practice of charging multiple fees for the representment of the same item. For example, Air Academy Federal Credit Union clearly states that an NSF fee is "$32.00 **per presentment**." (Emphasis added.)

61.     Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds.

(Emphasis added.)

62.    Delta Community Credit Union states its NSF fee is "$35 **per presentment**." (Emphasis added.) Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

(Emphasis added.)

63.    Glendale Federal Credit Union lists its NSF fee as "$30 **per presentment**."

(Emphasis added.)

64.    First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

(Emphasis added.)

65.    First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and any subsequent presentment(s)." Further, in its Account Agreement, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times.** For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or

27

entity) to electronically debit your account, such as an ACH debit**, you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**.

(Emphasis added.)

66.     Liberty Financial states its NSF fee is "27.00 **per presentment**."

(Emphasis added.)

67.     Los Angeles Federal Credit Union lists its NSF fee as "$29 **per presentment**."  (Emphasis added.)

68.     Members First Credit Union states:

> We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** . . . .

(Emphasis added.)

69.     Meriwest Credit Union lists its fee as "$35.00/item **per presentment**."

(Emphasis added.)

70.     Partners 1st Federal Credit Union states:

> Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

(Emphasis added.)

71.     Regions Bank states:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

(Emphasis added.)

72.     Tyndall Federal Credit Union lists its NSF fee as "$28.00 **per presentment** (maximum 5 per day)." (Emphasis added.)

**Pay All, Next Day Return**

73.     City National also improperly withdraws from an account the full amount of debit items that it labels as overdrafts even when it will return the debit item as unpaid and no money will ever be debited from the account for that item. Instead, after debiting the money from the account one day under the guise of it being an "overdraft" that will be paid, City National instead returns the item unpaid the following day and credits back to the account the premature debit. But by debiting the accountholder's money in the interim even when the money is still in the account, it lowers the account balance making it more likely that other subsequently processed items will be assessed overdraft or NSF fees. Here's how it works. Say the account holder starts with a balance of $200. City National receives an account holder's instruction for payment of a medical bill for $300 on Monday. City National determines the account does not contain enough money to cover the $300 bill payment but classifies the transaction item as an overdraft that it has paid and debits the account $300 and charges a $25 overdraft fee as a result. Thus, as of Monday, the account balance is reduced by $325 and now is in the negative, and it appears as though City National has covered/paid the $300 bill. All transactions big and

small following that removal of $325, would be an overdraft triggering an overdraft fee even though there is $200 still in the account. But on Tuesday, City National instead returns the $300 bill unpaid and credits the account for the $300 debit the prior day and changes the $25 overdraft fee to a $25 NSF fee. The practical effect of this maneuver lowers the account balance on Monday by $300—which increases the likelihood that subsequent transactions on Monday will be assessed overdraft fees before the $300 is credited back to the account on Tuesday.

74.     While this practice is unfair, City National's contracts and disclosures also do not identify this practice, instead stating that transactions are processed nightly on the day received.

## VI     FACTUAL ALLEGATIONS AGAINST DEFENDANT

### A.     Violation of Regulation E

75.     At all relevant times, City National used the "available balance," and not the actual account balance to determine whether to assess overdraft fees on one-time debit card and ATM transactions.

76.     At all relevant times, City National knew or should have known, that in order to legally charge its customers overdraft fees, it was required to first obtain affirmative consent from the customer using a Regulation E compliant stand-alone opt-in disclosure. Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language before obtaining consent from a customer to "opt in" to those programs.

77.     At all relevant times, on information and belief, City National used an identical opt-in disclosure agreement with Plaintiff and all putative Class Members.

30

78.     On information and belief, the opt-in disclosure agreement did not accurately and in a clear and easily understandable way describe City National's overdraft services including, but not limited to, failing to clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice and/or identify its practice of debiting accounts for transactions it labels as "overdrafts" only to return them unpaid the next day.

79.     Because, on information and belief, City National uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices and thus is not compliant with Regulation E, City National is not permitted to charge customers overdraft fees on one-time debit card and ATM transactions.

80.     At all relevant times, City National knew it was using the available balance to assess overdraft fees and that it first labeled transactions as overdrafts when, in reality, the items would be returned unpaid the following day, and further knew or should have known that these practices had to be clearly and accurately described in a stand-alone document. City National also knew or should have known that its opt-in disclosure agreement was not providing an accurate, clear and easily understandable definition of an overdraft.

81.     At all relevant times, City National charged Plaintiff and the putative class members overdraft fees on one-time debit card and ATM transactions even though it had not complied with Regulation E to first obtain customers' affirmative consent using a Regulation E compliant opt-in disclosure agreement before it charged these fees, and while using practices to actively encourage customers to opt-in to Reg E overdraft coverage.

82.     Based on information and belief, City National continues to "opt-in" to its overdraft program customers using a non-compliant opt-in disclosure agreement and other prohibited practices, and then charges those customers overdraft fees on one-time debit card and ATM transactions.

83.     Based on information and belief, City National continues to charge existing customers overdraft fees on one-time debit card and ATM transactions who had "opted-in" using that same non-compliant opt-in disclosure agreement.

**B.     Violations of the Account Agreement and Other Disclosures**

84.     At all relevant times, City National has had an overdraft and NSF fee program in place which, *inter alia*, is: 1) contrary to the express and implied terms of its contracts with customers; 2) contrary to City National's representations about its overdraft and NSF fee program to its customers; and 3) contrary to its customers' expectations regarding the assessment of such fees.

85.     City National has an improper practice of charging multiple fees for the same electronic item. City National charges a $25 fee when an electronic item is first processed for payment at the request of an account holder and City National determines that there is not enough money in the account to cover the item. City National then charges an additional NSF or overdraft fee if the same item is presented for processing again by the payee.

86.     City National's practice of charging additional NSF or overdraft fees for the representment of the same item violates its "Consumer Deposit Account Agreement and Disclosure" (hereinafter "Account Agreement"). (The Account Agreement attached hereto as Ex. 1, dated August 2019, is believed to be one of the operative agreements during the class period and representative of the account agreements in the class period.)

The Account Agreement is a uniform written contract that City National entered with Plaintiff and the other Class Members The Account Agreement specifically defines "[a]n '[i]tem'" (singular) as including:

> a check, substitute check, purported substitute check, electronic item or transaction, draft, demand draft, remotely created item, image replacement document indemnified copy, ATM withdrawal or transfer, point-of-sale transaction, pre-authorized payment, automatic transfer, telephone-initiated transfer, ACH transaction, online banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, any other instruction or order for the payment, transfer, or withdrawal of funds, and an image or photocopy of any of the foregoing.

(Ex. 1, at 19.) Throughout the Account Agreement, City National then states that *an* NSF fee is assessed for *an* item. For instance, when describing how non-sufficient funds transactions work in the absence of overdraft protection, it provides an example: if a customer has a $50 balance and "write[s] a check for $100, [City National] will return your check unpaid and charge your account ***a fee*** (in this example, $25)." (*Id.*, at 12 (emphasis added).) When referring to a debit item that is posted to an overdrawn account, it says it will be subject to "a[] . . . fee of $25." (*Id.*) And in a section titled "Important Information" when discussing an overdraft debit item, "including checks written, ATM withdrawals, ACH debits, point of sale debit card transactions or any other electronic transaction," it states in bolded print that **"[e]ach overdraft [item] paid or returned will be subject to a fee ($25)."** (*Id.*, at 13 (emphasis in original).) This is reiterated in a section titled "Overdraft Protection Terms and Conditions. (*Id.*, at 14.) The Account Agreement further states **"[a]ny overdraft items in excess of your Overdraft Protection limit may be paid or returned at the Bank's discretion and assessed a fee."** (*Id.* (emphasis in original).) Further, when describing how overdraft protection works with a debit card, it states if you do not opt-in to Regulation E overdraft coverage, "[t]hese transactions will be declined when you do not have enough money in your account" and no "non-sufficient item *fee*" will be charged (although the customer "may

be charged a Visa Debit Card denial fee"). (*Id*., at 12 (emphasis added).) Finally, in a section on "Overdrafts" it states "[w]hen *you* transmit a transfer or payment request to us, *you* authorize us to charge your account for the amount indicated. If your account does not have sufficient available funds, we may reject the transaction. We may charge *a fee* for each payment or transfer request presented against an account with non-sufficient funds." (*Id*., at 20 (emphasis added).)

87.     In other words, City National's own Account Agreement states, in the singular, that it will assess "a fee," not plural "multiple insufficient funds fees." Further, City National defines "an item" as a single electronic transaction based on a "transfer or payment request" from an account holder. Nowhere does the Account Agreement explain that "representment" or "retry" of "an item" by a payee (as opposed to the account holder) changes it into a new or different item. It is still the same "item" being presented in the same dollar amount; not a new "item." An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the account holder, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes. Furthermore, although Plaintiff is unaware at this time whether City National's Fee Schedule was ever served on Class Members in a manner required to make it effective, the Fee Schedule also refers to a singular "Non-Sufficient Funds Fee" of "$25.00." (*See* Ex. 2, Fee Schedule, dated August 2020.)

88.     City National's standardized Account Agreement and Fee Schedule misrepresent to account holders that Defendant will only charge a single fee on an item. Further, because City National charged NSF fees improperly, and because City National's improper deduction of additional improper $25 fees from a customer's account further decreased the customer's "balance" or "available balance," it likely generated even more NSF fees or overdraft fees to the account.

34

89.     Courts in various jurisdictions have recognized that when banks and credit unions charge multiple NSF fees on the same item while failing to clearly disclose such practice, it gives rise to claims and causes of action on a class-wide basis. *See e.g., Morris v. Bank of America*, No. 3:18-cv-00157-RJC-DSC, 2019 WL 1274928, at *2, 4 (W.D.N.C., Mar. 29, 2019) (upholding magistrate judge's recommendation denying motion to dismiss for breach of contract repeat NSF fee claim); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, 2019 WL 7176777, at *1 (E.D. Ark. Oct. 21, 2019) (permitting claims to proceed where defendant bank promised to assess a single NSF fee per item); *Noe v. City National Bank of West Virginia*, Civil Action No. 3:19-0690, 2020 WL 836871, at *5-7  (S.D.W.V. Feb. 19, 2020) (denying motion to dismiss breach of contract claim based on the assessment of repeat NSF fees for the same electronic transaction or "item"); *Perks, et al. v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639-42 (S.D.N.Y. Mar. 17, 2020) (denying dismissal of a breach of contract claim based on the assessment of repeat NSF fees for the same item due to the ambiguity in the definition of "item"); *Coleman, et al. v. Alaska USA Federal Credit Union*, Civil Action No. 3:19-cv0229-HRH, 2020 WL 1866261, at *4  (D. Alaska Apr. 14, 2020) (order denying motion to dismiss plaintiffs' breach of contract and good faith and fair dealing claims for repeat NSF fees).[13]

---

[13] *See also* the following state court case decisions and unpublished federal cases finding the same: *Baptiste v. GTE Federal Credit Union*, 20-CA-002728 (13th Judicial Court, Hillsborough Co., Florida, July 8, 2020); *Ingram v. Teachers Credit Union*, Cause No. 49D011908-PL-035431 (Indiana Commercial Court, Marion County Superior Court, Feb. 18, 2020); *Darty v. Scott Credit Union*, No 19L0793 (St. Clair Co., Ill., June 24, 2020); *Vocaty v. Great Lakes Credit Union*, No 19-L-727 (Lake Cty. Cir., Ill., June 3, 2020); *Brown v. Educators Credit Union*, No. 2019CV1814 (Racine Co., WI, July 1, 2020); *Duncan v. BancFirst*, No. CJ-2020-348 (Dist. Okla. Cty., June 3, 2020); *Romohr v. The Tennessee Credit Union*, No. 19-1542-BC (Davidson Co. Tenn. Chancery Court, May 19, 2020); *Almon v. Independence Bank,* Case No. 19-CI-00817 (Ky. Cir. Ct., McCracken

90.    Moreover, City National violates the terms of the Account Agreement through its practice of debiting accounts for transactions it labels as "overdrafts" only to return them unpaid the next day, which inaccurately reduces the account's balance for the term of the debit. The Account Agreement only describes an item as being returned unpaid; not first being debited from the account as though paid, then later being returned unpaid. (*See*, Ex. 1, at 12.) For example, when describing how non-sufficient funds transactions work in the absence of overdraft protection, it states if a customer has a $50 balance and "write[s] a check for $100, the Bank will return your check unpaid and charge your account *a fee* (in this example, $25)." (*Id*.) The Account Agreement does not say it will first determine the item to be an overdraft and debit from the account the amount of the transaction as if it is being paid, and then reclassify the item as a non-

County, Mar. 18, 2020); *Perri v. Notre Dame Federal Credit Union,* No. 71C01-1909-PL-000332 (Ind. Cir. Ct. St. Joseph Cty., March 2, 2020); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co., MO Circuit Court, Oct. 18, 2019); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn. Chancery Court, Oct. 17, 2019); *McMurrin v. America First Credit Union*, Case No: 190909065 CN (3rd District Court, Salt Lake County, Utah) (May 5, 2020); *Teel v. HAPO Community Credit Union*, No. 19-2-03193-03 (Super. Ct., Benton Cty., Wa.); *Garciga v. South Florida Educ. Fed. Credit Union*, No. 2020-000733-CA-01 (Miami-Dade Cty., Fla. June 19, 2020); *Young v. The Washington Trust Co.,* 1:19-cv-00524-WES-PAS (D.R.I.) (June 2, 2020); Pierce v. Safe Credit Union, No. 34-2020-00275892-CU-CO-GDS (Superior Court of California, County of Sacramento, Oct. 29, 2020); Williams v. Travis Credit Union, No. FCS054738 (Superior Court of California, County of Solano, Oct. 14, 2020); n Hewitt v. UW Credit Union, No. 20-cv-1295 (Dane County (WI) Circuit Court, Nov. 5, 2020); Rivera v. IH Mississippi Valley Credit Union, Case No. 2019 CH 299 (Ill. Cir. Ct. of the Fourteenth Jud. Cir., Oct. 30, 2020); *McNeil v. Capital One Bank, N.A.,* No. 1:19-cv-00473-FB-RER (E.D.N.Y. Sept. 29, 2020) (ECF 48); *Jones v. Lake Michigan Credit Union*, No. 20-000240-CK (Washtenaw Co. Mich. Sept. 29, 2020); *Roy v. ESL Federal Credit Union*, No. 19-CV-6122-FPG (W.D.N.Y. Sept. 30, 2020 (ECF 57); *Varga v. American Airlines Credit Union*, Case No. 2:20-cv-04380 (C.D. Cal., Dec. 1, 2020); *Wilkins, et al. v. Simmons Bank*, Case No. 3:20-cv-116-DPM (E.D. Ark., Dec. 9, 2020); *Burgos v. Campus USA Credit Union*, Case No. 01-2020-CA-1175 (Alachua Cty., Florida, Dec. 7, 2020); *Glass, et al. v. Delta Community Credit Union*, Case No. 2019CV317322 (Fulton Cty., Georgia, Dec. 8, 2020); and *Chambers v. HSBC Bank USA, N.A.*, Case No. 1:19-cv-10436-ER (S.D.N.Y. Dec. 10, 2020).

sufficient funds transaction to be returned unpaid the next day. In fact, the Account Agreement throughout describes non-sufficient funds transactions in the same context as overdrafts which are supposedly processed the day they are posted. Moreover, when discussing how items are processed in an account, the Account Agreement explains that processing occurs at the "end of a business day" and that City National posts transactions to the account "during nightly processing as the end of each business day." (*Id.*, at 15.) No reasonable customer would suspect that City National first processes items as overdrafts at the end of the business day, thus allowing it to debit funds from an account, only to recharacterize the transaction the following day as an NSF (meaning the money never should have been debited from the account in the first place). But by processing NSF transactions in this manner, City increases the likelihood that other transactions will be deemed overdrafts in the interim, and thus creates the potential to charge its account holders with additional fees.

91.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts. Meanwhile, Plaintiff and the Class Members could not have reasonably anticipated the harm resulting from Defendant's practice throughout the class period because the Account Agreement and Fee Schedule specifically stated that only a singular fee would be charged for "an" item and that transactions are processed daily with no mention of recharacterizing them the following day.

92.    Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

## IV    PLAINTIFF'S HARM

93.    Plaintiff has held an account with City National at all times relevant to the allegations and is believed to be opted into its overdraft program for her debit card and ATM transactions.

94.    As will be established using City National's own records, Plaintiff has been assessed numerous improper fees on debit card and ATM transactions. On November 9, 2020, Plaintiff was assessed a $25 overdraft fee because of a $0.99 non-recurring debit card transaction. This happened again—three more times—on $0.99 transactions. Thus, on just one day, Plaintiff was assessed $100 in overdraft fees for transactions totaling less than $4. Based on information and belief, City National assessed each of these fees although it used a non-compliant opt-in disclosure agreement to garner Plaintiff's affirmative consent to be charged such fees in violation of Regulation E requirements. Thus, City National was not permitted to charge Plaintiff these fees.

95.    City National also assessed Plaintiff improper fees based on its policy and practice of charging an NSF fee more than once for the same "item." By doing so, Defendant breached its contracts with Plaintiff and the absent Class Members. As an example, on October 22, 2020, Plaintiff initiated a $102.58 payment to State Farm, which City National returned as unpaid on October 23, 2020 (after first treating it as an overdraft). On the day it returned the payment, City National charged Plaintiff a $25 "NSF Return Item Fee" for the unpaid item. This fee is not in dispute. But City National also charged Plaintiff another $25.00 NSF fee on October 29 when State Farm resubmitted the same $102.58 item (labeled as a "Retry Pymt"), and City National again returned it as unpaid. In charging that second $25 fee for the same $102.58 item, City National in effect increased the fee for the returned item from $25 to $50. The second

$25 charge was not authorized because it directly conflicts with the Account Agreement, which establishes that the fee for a single NSF transaction is $25, not $50. Moreover, if City National had not improperly assessed the second NSF fee on the State Farm payment, Plaintiff would have been able to pay the subsequent $0.99 debit card charge that elicited yet another overdraft fee.

96.     City National further increased its fees by debiting from Plaintiff's account transactions labeled as overdrafts and then crediting the funds back to the account the following day when City National returned the transaction as unpaid, thus increasing the likelihood that other transactions would be processed on insufficient funds in the interim. For instance, on January 10, 2020, Plaintiff had a positive account balance of $76.22. She then wrote a check for $90. City National debited her account for $90 on January 10, and assessed a $25 overdraft fee. On January 11, however, City National returned the check as unpaid, credited Plaintiff's account for the $90, and renamed the $25 overdraft fee as an NSF fee. By debiting the $90 from the account on Monday, however, it caused City National to consider Plaintiff's next check an overdraft/NSF transaction as well. If City National had returned the check as unpaid on January 10, it would have had no pretextual excuse to debit $90 from the account, and even with a $25 NSF fee, Plaintiff's balance would have remained positive leaving enough funds in the account to cover the next check for $42. Instead, City National determined that the account had insufficient funds on January 10, so it returned the $42 check and assessed another fee. Thus, City National assessed Plaintiff an unnecessary NSF fee and caused Plaintiff to face the potential of further penalty from the payee for the returned check, even though Plaintiff would have had money in the account if City had properly processed the $90 on the first day it was presented.

97.     The extent of improper charges City National assessed upon Plaintiff and other customers will be determined in discovery using City National's records.

98.     Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in 2020. While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2020 because City National hid its actual practices from its customers by describing different practices in its contracts and other materials disseminated to its customers. This not only reasonably delayed discovery, but City National's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop City National.

## VII    CLASS ACTION ALLEGATIONS

99.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

100.    Plaintiff brings this case, and each of the respective causes of action, as a class action.

101.    The "Class" is composed of the following:

The Regulation E Class:

> All customers of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified.

The Repeat NSF Class:

> All customers of Defendant who have or have had accounts with Defendant who incurred more than one NSF fee or an NSF fee followed by an overdraft fee for the same item during the period beginning five years preceding the filing of this Complaint and ending on the date the Class is certified.

The Pay All, Next Day Return Class:

All customers of Defendant who have or have had accounts with Defendant who incurred an overdraft or NSF fee following an initial transaction processed as a paid item that left insufficient funds in the account to pay subsequent items that would not have resulted in a negative balance overdraft or NSF fee if the initial item had been processed as returned or unpaid on the initial day of processing during the period beginning five years preceding the filing of this Complaint and ending on the date the Class is certified.

102. Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

103. Following discovery, these definitions may be amended as appropriate.

104. This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

105. **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands of customers.

106. Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's customers has been harmed by its practices and thus qualify as a Class Member. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common

41

characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

107.     **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- whether Defendant used the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions;

- whether the opt-in disclosure agreement Defendant used to opt-in Class Members violated Regulation E because Defendant's opt-in disclosure agreement is not a stand-alone document that accurately, clearly, and in an easily understandable way describes Defendant's overdraft services;

- whether Defendant breached Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Customers;

- whether, pursuant to the Account Agreement and/or Fee Schedule, Defendant contracted to charge "a" single fee for an NSF "item" rather than repeat fees for the same "item;"

- whether Defendant breached the Account Agreement and/or Fee Schedule by assessing repeat fees on the same "item;"

- whether, pursuant to the Account Agreement, Defendant was permitted to remove funds from an account on the initial day of processing for an "overdraft" transaction, only to credit the money back to the account the next day and return the transaction as unpaid;

- whether Defendant breached the Account Agreement by removing money

from the account on the initial day of processing only to credit the money back to the account the next day and return the transaction as unpaid:

- whether the language of the Account Agreement and/or Fee Schedule is ambiguous;

- whether Defendant is liable for breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received; and

- whether Defendant continues to violate Regulation E and unjustly enrich itself by opting in customers using an opt-in disclosure agreement that violates Regulation E, and continuing to assess customers overdraft fees on one-time debit card and ATM transactions based on an opt-in disclosure agreement that violates Regulation E.

108. **<u>Typicality</u>** – Plaintiff's claims are typical of all Class Members. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure agreement used to opt-in Plaintiff is the same as the opt-in disclosure agreement used by Defendant to opt-in the Class Members. Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions. Further the Account Agreement and Fee Schedule between Defendant and its customers were identical as to all relevant terms, and also because, *inter alia*, the challenged practice of charging customers multiple fees for the same item, and removing money from an account on the initial day of processing only to credit it back the following day and return the transaction unpaid, was uniform for Plaintiff and all Class Members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

109.     **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the customers of the Class that would make class certification inappropriate. Plaintiff and counsel intend to prosecute this action vigorously.

110.     **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would

preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

111. Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

112. Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

113. This matter is properly maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual customers of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual customers of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual customers of the Class would, as a practical matter, be dispositive of the interests of the other customers not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to the customers of the Class and predominate over any questions affecting only individual customers, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the customers of the Class in individually controlling the prosecution or defense of separate actions;
- the extent and nature of any litigation concerning the controversy already commenced by or against customers of the Class;
- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

114. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rules of Civil Procedure, Rule 23(b)(2). Moreover, on information and belief, Plaintiff alleges that Defendant's use of a non-compliant Regulation E opt-in disclosure agreement is substantially likely to continue in the future if an injunction is not entered.

## FIRST CAUSE OF ACTION
## (Violation of Regulation E)

115. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

116.     By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumer," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b).

117.     Specifically, Defendant's charges violated Regulation E's "Opt In Rule." *See* 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added). The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account, nor can the financial institution influence a customer's decision to opt-in.

118.     The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate . . .</u> by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily</u>

understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational," and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

119.    Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against customers' accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions. On information and belief, Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a stand-alone disclosure agreement that in a "clear and readily understandable way" describes the overdraft program, meeting the strictures of 12 C.F.R. § 1005.17. On information and belief, the opt-in disclosure agreement does not accurately and in an easily understandable manner describe City National's overdraft services including, but not limited to, failing to clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice and/or failing to clearly describe its practice of debiting accounts for transactions it labels as "overdrafts" only to return them unpaid the next day, which inaccurately reduces the account's balance for the term of the debit.

120.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, Defendant was not legally permitted to assess any overdraft

fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

121.    As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and customers of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION

### (Breach of the Account Agreement – Repeat NSF Fees on the Same Item)

122.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

123.    Plaintiff and each of the Class Members entered into the Account Agreement, an example of which is attached hereto as Ex. 1, with Defendant covering the subject of NSF and overdraft fees. This contract was drafted by and is binding on Defendant.

124.    Among other promises Defendant makes in the Account Agreement, Defendant promises that it will assess only a single NSF fee for an unpaid, returned item due to purported insufficient funds when, in practice, it charges a $25 fee when an electronic item is first processed for payment and Defendant determines that there is not enough money in the account to cover the transaction, and then charges an additional NSF or overdraft fee if the same item is presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment.

125.    The Account Agreement specifically defines "[a]n '[i]tem'" (singular) as including:

> a check, substitute check, purported substitute check, electronic item or transaction, draft, demand draft, remotely created item, image replacement document indemnified copy, ATM withdrawal or transfer, point-of-sale transaction, pre-authorized payment, automatic transfer, telephone-initiated

> transfer, ACH transaction, online banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, any other instruction or order for the payment, transfer, or withdrawal of funds, and an image or photocopy of any of the foregoing.

(Ex. 1, at 19.) Moreover, throughout the Account Agreement, Defendant states that *an* NSF fee is assessed for *an* item, as alleged herein. Yet Defendant wrongfully treats a "retry" or "representment" of an item as a new and separate "item" justifying additional NSF or overdraft fees in violation of the Account Agreement.

126.  Further, the Account Agreement along with the Fee Schedule fail to accurately describe the circumstances when Plaintiff and Class Members will be assessed an NSF fee.

127.  Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

128.  Defendant breached the terms of the Account Agreement by, *inter alia*, assessing multiple fees for the same item.

129.   As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION

(Breach of the Account Agreement – Pay All, Next Day Return)

130.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

131.    Plaintiff and each of the Class Members entered into the Account

Agreement with Defendant covering the subject of NSF and overdraft fees. The Account

Agreement was drafted by and is binding on Defendant.

132.    Among other promises Defendant makes in the Account Agreement, it

claims to process transactions daily. Yet, City National's practice during daily processing

is to withdraw from an account the full amount of debit items and label them as

overdrafts.  However, after debiting the money from the account on day one under the

guise of it being paid as an "overdraft," City National returns the item unpaid the

following day and credits back the premature debit to the account and no money is

actually ever debited from the account for that item.  But by debiting the account holder's

money in the interim even when the money is still in the account, it lowers the account

balance making it more likely that subsequently processed items will be assessed

overdraft or NSF fees.

133.    The Account Agreement only describes an item as being returned unpaid.

(*See*, Ex. 1, at 12.) When describing how non-sufficient funds transactions work in the

absence of overdraft protection, it states if a customer has a $50 balance and "write[s] a

check for $100, the Bank will return your check unpaid and charge your account *a fee* (in

this example, $25)." (*Id*.) It does not say it will first determine the item to be an overdraft

and debit the funds from the account as if it is being paid, only to later reclassify it as a

non-sufficient funds transaction the following day. In fact, throughout the agreement, it

discusses non-sufficient funds transactions in the same context as overdrafts, which

Defendant processes and posts on the day they are presented. Moreover, when discussing

how items are processed in an account, the Account Agreement explains that processing

occurs at the "end of a business day" and that transactions post to the account "during

51

nightly processing as the end of each business day." (*Id.*, at 15.) A reasonable customer would not suspect that Defendant first processes items as overdrafts at the end of the business day, thus allowing it to debit funds from an account, only to recharacterize the transaction the following day as an NSF (meaning the money never should have been debited from the account). But by processing non-sufficient funds transactions in this manner, City National increases the likelihood that other transactions will be deemed overdrafts in the interim.

134. The Account Agreement inaccurately describes how non-sufficient funds transactions will be processed.

135. Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

136. Defendant breached the terms of the Account Agreement by, *inter alia*, labeling and treating all transactions as overdrafts on the day of processing, and returning certain of the transactions as unpaid the following day when its contracts state otherwise.

## FOURTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

137. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

138. Plaintiff and each of the Class Members entered into the Account Agreement with Defendant covering the subject of NSF transactions. Defendant drafted and is bound by the Account Agreement. In the agreement, Defendant promised to charge only a single fee for an item. Yet Defendant assessed NSF and/or overdraft fees multiple times for the same item. Further, Defendant debited accounts for overdraft items even

52

though the items were returned the next day as unpaid when the Account Agreement said transactions were processed and posted daily.

139.    Good faith is an element of every contract. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

140.    The material terms of the Account Agreement therefore include the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

141.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

142.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple fees for a single, unpaid returned item, or by assessing an overdraft fee on the same item that was previously assessed an NSF fee, and by debiting accounts for overdraft items one day and then returning the items unpaid the next day. Defendant could easily have avoided acting in this manner by

simply changing the programming in its software to charge a fee only once per item, or to process transactions as unpaid on the initial day of processing. Instead, Defendant unilaterally elected to and did program its software to charge multiple fees each time the same item was represented for payment by a merchant, and to prematurely debit transactions from an account when the following day they were to be returned, which maximized its overdraft and NSF fees. In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, Defendant executed its contractual obligations, including any discretion it had, in bad faith, depriving Plaintiff and the Class Members of the full benefit of the Account Agreement.

143.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

144.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

145.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

146.    Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds,

Defendant would be unjustly enriched. Therefore, Plaintiff and Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Money Had and Received)

147. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

148. Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

149. As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members. Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## VIII   PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

a. for an order certifying this action as a class action;

b. for compensatory damages on all applicable claims and in an amount to be proven at trial;

c. for an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

d. for statutory damages;

e. for civil penalties;

f. for an order enjoining the continued wrongful conduct alleged herein;

g.     for costs;

h.     for pre-judgment and post-judgment interest as provided by law;

i.     for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

j.     for such other relief as the Court deems just and proper.

Dated: January 14, 2021                Respectfully Submitted,

/s/Barrett T. Bowers

Barrett T. Bowers, OBA No. 30493
barrett@bowerslawok.com
**THE BOWERS LAW FIRM**
P.O. Box 891628
Oklahoma City, Oklahoma 73189
Telephone:   (405) 727-7188

-and-

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
David C. Wright, CA Bar No. 177468*
dcw@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:   (909) 557-1250
Facsimile:    (909) 557 1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, Illinois 62025
Telephone:   (618) 307-6116
Facsimile:    (618) 307-6161

Attorneys for Plaintiff Lisa Carter
and the Putative Class

*Pro Hac Vice* application to be submitted

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: January 14, 2021

Respectfully Submitted,

*/s/Barrett T. Bowers*

Barrett T. Bowers, OBA No. 30493
barrett@bowerslawok.com
**THE BOWERS LAW FIRM**
P.O. Box 891628
Oklahoma City, Oklahoma 73189
Telephone:    (405) 727-7188

-and-

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
David C. Wright, CA Bar No. 177468*
dcw@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:    (909) 557-1250
Facsimile:    (909) 557 1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, Illinois 62025
Telephone:    (618) 307-6116
Facsimile:    (618) 307-6161

Attorneys for Plaintiff Lisa Carter
and the Putative Class

**Pro Hac Vice* application to be submitted